In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 16-3497

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHELE DICOSOLA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cr-00446-1 — **Harry D. Leinenweber**, *Judge.*

_____

ARGUED MAY 24, 2017 — DECIDED AUGUST 14, 2017

_____

Before POSNER, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* The financial crisis of the late 2000s hit Middle America quite hard. According to an analysis of United States Census data, over 170,000 small businesses shut down during the first two years of that recession.[1] Owners were faced with tough choices—many putting their

---

[1] G. Scott Thomas, *Recession claimed 170,000 small businesses in two years*, THE BUSINESS JOURNALS, July 24, 2012.

businesses through bankruptcy, many losing personal fortunes, many foregoing salaries to keep their operations running and workers employed. These were legitimate options. Some, however, chose illegitimate options. By all accounts, Michele DiCosola was, until 2007, a legitimate business owner. But when the crash came, he engaged in loan fraud and tax fraud in order to make ends meet. While his personal story is unfortunate, it does not excuse his criminal conduct. Because we find no abuse of discretion in any of the district court's rulings on appeal, we AFFIRM Michele DiCosola's conviction and restitution orders.

## I.   BACKGROUND

Michele DiCosola is the son of first-generation Italian immigrants. In the late 1990s he started a business, CD Shape Cutters, which produced compact discs (physical, digital storage devices) in novelty shapes, which were used as promotional items. The business did very well, morphing into a full-service printing and duplicating business, ultimately reaching about $1 million in gross annual sales and employing up to ten people, including DiCosola's immigrant father, Michelangelo. Michelangelo even invested his retirement savings in the business.

In about 2005, Michele DiCosola started a side business for producing Latin pop music. This new endeavor quickly sapped cash from CD Shape Cutters, and in 2007, CD Shape Cutters began to experience serious financial difficulties. In September 2007, DiCosola applied to Citibank for a home loan to refinance his mortgage, but was rejected for insufficient income: he provided authentic 2005 and 2006 tax returns which showed negative income, and income of a few thousand dollars, respectively. He applied to Citibank for a

home loan again in 2008, this time providing fabricated, never-filed 2005, 2006, and 2007 tax returns that inflated his income by hundreds of thousands of dollars. These fabricated returns were signed by DiCosola's accountant, John Cerami. The loan application was accompanied by a release that would have allowed Citibank to obtain his prior tax returns directly from the IRS. Unfortunately for Citibank, it had shredded copies of DiCosola's accurate tax returns from his prior application but did not obtain from the IRS his currently-filed returns. In other words, while Citibank had the means to discover DiCosola's real income, for whatever reason it did not do so. Without that information, Citibank issued DeCosola a loan in the amount of $273,567, which he immediately used to pay off other debts.

Also in 2008, DiCosola applied for two business loans with Amcore Bank, and provided Amcore the same fabricated tax returns for 2005, 2006, and 2007. Amcore approved the loans and funded them in July 2008. The first loan—for $450,000—DiCosola used to pay off another business loan. The second loan was a $300,000 line of credit which DiCosola used to pay employees and fund business operations at CD Shape Cutters. In early 2009, after a few payments DiCosola defaulted on both the Amcore loans and the Citibank loan.

Also in early 2009, DiCosola prepared and filed his own tax returns. In Schedule B of his return, he listed his various loan/borrowing transactions with banks going back three years, with the total being around $8.4 million. The parties do not dispute the accuracy of this number which, as the government argues, almost certainly indicates reliance on taking out loans to pay off prior loans. For each of these reported transactions, DiCosola filled out a falsified IRS Form

1099-OID, claiming that the $8.4 million was interest income or a rebate credit, that he had *loaned* money to the various banks in the amounts that he had, in fact, *borrowed*. He claimed that these banks had withheld large sums of tax from these loans.[2] He then subtracted the taxes owed on this income, and ultimately claimed a refund of $5.5 million. DiCosola filed a tax return for his wife which was similar in all respects, albeit with smaller numbers. After having his return flagged as frivolous on April 10, 2009, DiCosola spent the next seven months in correspondence with the IRS before

---

[2] While the motivation behind the theory is not material to this case, the IRS puts out information for ordinary taxpayers explaining popular tax fraud techniques. *See* INTERNAL REVENUE SERVICE, IRS RELEASES THE DIRTY DOZEN TAX SCAMS FOR 2013, *available at* https://www.irs.gov/uac/newsroom/irs-releases-the-dirty-dozen-tax-scams-for-2013. For Form 1099 fraud, it explains:

**False Form 1099 Refund Claims**

In some cases, individuals have made refund claims based on the bogus theory that the federal government maintains secret accounts for U.S. citizens and that taxpayers can gain access to the accounts by issuing 1099-OID forms to the IRS. In this ongoing scam, the perpetrator files a fake information return, such as a Form 1099 Original Issue Discount (OID), to justify a false refund claim on a corresponding tax return.

Don't fall prey to people who encourage you to claim deductions or credits to which you are not entitled or willingly allow others to use your information to file false returns. If you are a party to such schemes, you could be liable for financial penalties or even face criminal prosecution.

ultimately sending another copy of the two fabricated returns to the IRS in mid-September. These two documents, rather than the initial filing of the returns, represent the basis for the indictment and conviction.

On June 12, 2012, DiCosola was indicted for multiple violations of federal law: two counts of bank fraud, in violation of 18 U.S.C. § 1344; one count of making false statements to a bank, in violation of 18 U.S.C. § 1014; and one count of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343, all in connection to the loans obtained from Amcore Bank and Citibank; two counts of filing false statements against the United States, in violation of 18 U.S.C. § 287, in connection with the tax fraud; and two counts of bankruptcy fraud, in violation of 18 U.S.C. § 152(3). DiCosola moved to dismiss one of the claims of bank fraud as duplicative, and moved to sever the bank fraud charges, the bankruptcy fraud charges, and the tax fraud charges. The district court granted these motions. The government chose not to move forward with trial on the bankruptcy-related charges, and following conviction, the government voluntarily dismissed them. This left three charges related to bank fraud set for a jury trial, and two charges related to tax fraud set for a bench trial. After a three-day jury trial and the bench trial, DiCosola was found guilty on all remaining counts, and on September 8, 2016, judgment was entered and DiCosola was sentenced on all five charged counts. He was sentenced to thirty months' imprisonment and two years of supervised release. A restitution order for $822,088.00 was also ordered paid to CitiMortgage and Harris Bank (a subsidiary of CitiBank and the bank which later purchased Amcore Bank). This appeal followed.

## II.  DISCUSSION

A. Loan Fraud

With respect to his loan fraud conviction, DiCosola challenges the district court's denial of his motion for a new trial on multiple grounds relating to the testimony of his accountant, John Cerami. He also raises an unrelated charge that the government did not correct a false statement by a government witness during cross-examination. *Napue v. Illinois*, 360 U.S. 264, 269 (1957). Each of these arguments fails to demonstrate any abuse of discretion by the district court, and so we affirm the conviction.

DiCosola's defense to his loan fraud charge was that he had requested that Cerami prepare new tax returns for prior years that showed inflated income so that DiCosola could obtain loans. Cerami allegedly prepared these returns and signed them, indicating that they were not fraudulent and capable of being filed with the IRS. DiCosola's various grounds for a new trial all relate to the belief that the government coerced Cerami to testify before the grand jury that the returns were "hypothetical" (i.e., false). Because DiCosola claims that the returns were not false, he insists that the indictment was solely based upon coerced, intentionally false testimony. By getting Cerami on record in this way, Cerami's credibility as a defense witness was ruined.

The government, for its part, never called Cerami as a witness: he testified solely for the defense. As a result, it strains credulity to say that there was insufficient evidence to indict, or that the defendant is entitled to the release of the grand jury transcripts. *United States v. Fountain*, 840 F.2d 509, 514 (7th Cir. 1988). Cerami, a cagy witness, presented

different glosses on what he did with the defendant's tax returns in different contexts. And there is certainly nothing wrong with preparing "hypothetical" tax returns that demonstrate differing interpretations of an income situation. In DiCosola's case, he filed tax returns demonstrating higher capital expenditures which would, presumably, allow him to take depreciation losses on future-year tax returns. Cerami, in the "hypothetical" tax returns, would seek to average capital expenditures, reducing variation but also accelerating income and requiring DiCosola to pay more up-front in taxes. Perhaps, if DiCosola had consistently used the latter method, he could have legally filed the "hypothetical" income returns. But he chose not to file them. Instead he used one accounting method for his actual tax returns and a different accounting method for the tax returns he provided to the banks to obtain loans. Whatever Cerami or DiCosola intended when preparing these documents, the jury was presented with sufficient evidence to conclude that DiCosola knew they were not the returns that he filed, and that he presented them to two banks as if they were.

The *Napue* claim fares no better. DiCosola argues that the government suborned perjury when one government witness made an off-hand remark on the stand, in response to defense counsel questioning. While interpreting a loan document, a loan officer testified that DiCosola received "cash back" from his CitiBank loan, which was false. But the district court observed that this unintentional falsehood was quickly corrected, was immaterial, and was, rather than a knowing falsehood, a "reasonable" read of the loan document in front of the witness. Specifically, as noted above, DiCosola used the proceeds from the CitiBank loan to immediately pay off other debts: he did not walk out of the building with any "cash

back." Such a harmless error, prompted by defense counsel and not relied upon by the government, simply does not rise to the level of malfeasance requiring a new trial.

B. Tax Fraud

DiCosola challenges his tax fraud conviction on the sufficiency of the evidence. This claim is also without merit. DiCosola's appeal rests upon his contention that all the evidence demonstrates that he honestly believes in what defense counsel calls the "OID theory."

Unfortunately, people in desperate circumstances are susceptible to being sold on outlandish tax theories. However misled, DiCosola spent much time and money purchasing books and tapes and attending seminars that sold him a lie. A leading proponent of this theory, contacted by Mr. DiCosola after his arrest to testify in support of his tax theory, unconscionably took the opportunity to simply sell him another video.

Deceptive or just convoluted, this tedious sidetrack certainly does not mean that no rational trier of fact—in this case, the district judge—could find that the defendant knew that his letters to the IRS demanding a $5.5 million refund were fraudulent. *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016). As the district court noted, "there was no specific evidence as to [DiCosola's] actual subjective intent or his knowledge[ in the tax fraud case], so we have to go on circumstantial evidence which has been submitted by the government and through the defense through testimony of Mrs. DiCosola." There was ample circumstantial evidence before the district court to sustain Michele DiCosola's tax fraud convictions.

DiCosola had the motive to defraud the IRS, as he was in dire financial straits. He had used an accountant to file his prior years' tax returns and suddenly decided to self-file in 2009. His 2009 tax return was wildly different from his legitimately-filed prior tax returns. Further, DiCosola was told by the IRS that his OID theory was frivolous, and yet he persisted. One might interpret his repeat calls to the IRS as a sign of earnestness, but one might also reasonably interpret it as an attempt to create an exculpatory record, expecting inevitable trouble. Taken together, all of this circumstantial evidence is more than enough to allow the district judge to find DiCosola guilty of tax fraud.

C. Restitution Order

Finally, defendant objects to the district court order of restitution to Harris Bank (previously Amcore Bank) in the amount of $559,088. Specifically, he argues that the government proffered insufficient evidence for the loss amount to Amcore Bank, both because the sole evidence at sentencing was the presentence report and accompanying testimony of a parole officer, and because the auction of his property resulted in no reduction of restitution obligations. There is no dispute that the district court had authority to order restitution. Rather, DiCosola claims that the court abused its discretion by awarding an amount higher than supported by the evidence. *See United States v. Scalzo*, 764 F.3d 739, 744 (7th Cir. 2014). We find no abuse of discretion here, and affirm the award.

There is no *per se* rule that a restitution award need be supported by any particular form of evidence. The testimony of the parole officer was itself sufficient to sustain a restitution award. The officer specifically interviewed an assistant vice

president at Harris Bank who, in the officer's view, credibly reported the bank's losses attributable to defendant's fraud. Further, the probation officer interviewed the auctioneer who reported that the sale of defendant's property returned "nominal" proceeds. The probation officer, in the district court's view, provided reliable information sufficient to sustain a restitution award in the amount of $559,088. Rather than provide countervailing evidence, however, the defendant simply objected to the form of the evidence presented by the government, contending that sworn affidavits or other documentary evidence was necessary. Not so. The defendant at this point had the burden of presenting his own side of the story, with receipts or assessments of the value of his property before auction. *Id.* at 745. Presenting none, he effectively conceded the valuation by the government.

There is certainly an unsettling ambiguity in the testimony of the parole officer relating to his interview of the auctioneer. The officer testified that the auctioneer stated that sale of defendant's property returned "nominal sales proceeds." Certainly, *any* return in value for that auction should have reduced defendant's monetary obligation to the bank which collected the proceeds. Yet the bank stated to the parole officer that the auction proceeds did not reduce his obligations, and the auctioneer was presented with this information before he provided an explanation for why the return was so low.[3] What is left unsaid, presumably, is that running an auction

---

[3] Specifically, that the inventory was missing parts, that it was "custom" and so not suited for resale, and that the storage unit containing defendant's property was broken into, with much property looted.

does incur costs, so that the "nominal" proceeds were equal to or less than the overhead costs.

None of this is in the record, but the alternative is that the bank representative, the auctioneer, or the parole officer were inaccurate in their assessments. This might be the case, but the defendant ignored the opportunity to seek out and present evidence of this.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.