## STATE OF CONNECTICUT *v.* STEFON MORANT
### (SC 15194)

Borden, Berdon, Norcott, Katz and McDonald, Js.

---

[5] See footnote 1 of this opinion.

Argued March 20—officially released August 26, 1997

*Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Christopher T. Godialis*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David P. Gold*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Stefon Morant, appeals from the judgment of conviction, after a jury trial, of two counts of felony murder in violation of General Statutes (Rev. to 1989) § 53a-54c.[1] The trial

---

[1] General Statutes (Rev. to 1989) § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause

court sentenced the defendant to thirty-five years imprisonment on each count, to run consecutively, for an effective sentence of seventy years. The defendant appeals from the judgment of conviction to this court pursuant to General Statutes § 51-199 (b) (3). The defendant claims that (1) the evidence was insufficient to support his conviction of the two counts of felony murder, (2) the trial court improperly refused to order a competency examination of the state's key witness in abuse of its discretion and in violation of his federal and state constitutional rights to confrontation, (3) the trial court improperly instructed the jury regarding his alibi witnesses, and (4) the trial court improperly instructed the jury on the concept of reasonable doubt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1990, the defendant and Scott Lewis were partners engaged in the sale of drugs from a Clay Street house and on Exchange Street, both in New Haven. As part of this drug operation, Ricardo Turner stored drugs and cash in his second floor apartment at 634 Howard Avenue, New Haven. During the night of October 10 and the early morning hours of October 11, 1990, the defendant and Lewis were at the Clay Street house and discussed the possibility that Turner might take the money and leave. Ovil Ruiz and several other individuals who sold drugs for the defendant and Lewis were also present at the Clay Street house during this discussion.

Two handguns, a .357 caliber and a .38 caliber, were stored in the house. In the early morning hours of Octo-

---

or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

The defendant was acquitted of two counts of murder in violation of General Statutes §§ 53a-54a and 53a-8.

ber 11, 1990, either the defendant or Lewis told Ruiz
to get the guns, and Ruiz gave the guns to Lewis. The
defendant, Lewis and Ruiz then proceeded to travel in
Lewis' automobile to Turner's apartment on Howard
Avenue. On the way, the defendant stated, "whatever
happens, you know, keep it between us." At the apart-
ment, the defendant and Lewis exited the automobile
and Ruiz got into the driver's seat. Ruiz then waited in
the car while the defendant and Lewis went inside.
When the two of them entered the apartment house,
the defendant was carrying the .38 caliber handgun and
Lewis was carrying the .357 caliber handgun.

The defendant and Lewis forced their way into Turn-
er's apartment. They were in the apartment for thirty
minutes when, shortly after 4 a.m., they fatally shot
Turner and his roommate, Lamont Fields. Turner was
shot in the head, the back and the side. The bullet that
went into his side traveled through his body and into
his left arm. Fields was shot twice in the back. One
bullet passed through the floor and punctured a
waterbed in the apartment below. All of the bullet frag-
ments later recovered by police had been fired from a
.357 caliber handgun.

The defendant and Lewis then ran out of the apart-
ment, down the stairs, and into the waiting car. The
defendant took from the apartment a bag that contained
money, and Lewis took another bag that contained sev-
eral ounces of cocaine. As they drove away from the
scene, Lewis asked the defendant whether the defen-
dant thought he, Lewis, had killed Turner and Fields.
The defendant responded, "whatever happened,
happened."

In January, 1991, the defendant gave a statement to
police in which he admitted that he was with Lewis
during the early morning hours of October 11, 1990. He
stated that Lewis was taking him home when Lewis

stopped on Howard Avenue near the victims' apartment. The defendant stated that Lewis said "he had to take care of some business" and would be right back, and that Lewis then entered the apartment building while the defendant waited in the car. The defendant further stated that Lewis was perspiring when he came running from the apartment building to the car five or ten minutes later.

The defendant also told police that Lewis sold narcotics and that, when he and Lewis stopped on Howard Avenue, he thought Lewis was going to take care of some drug-related business. The defendant stated that the next day he learned that there had been a murder on Howard Avenue, and that a few days later, Lewis told the defendant that Lewis "did what [he] had to do" because one of the victims had owed Lewis "a couple dollars." The defendant further stated that at some later time he observed Lewis throw the gun that Lewis had used to commit the murders into the Mill River under the Chapel Street Bridge in New Haven.

I

The defendant claims that the evidence was insufficient to support his convictions of felony murder. The defendant was charged with committing a robbery with another person and in the course of and in furtherance of that robbery, the defendant or the other person caused the deaths of Turner and Fields. The defendant argues that the state's evidence does not establish that he engaged in a robbery, and, therefore, that the state failed to prove an essential element of the felony murder charges. Specifically, the defendant argues that he cannot be convicted of committing of a robbery because the evidence establishes that the drugs and money that he and Lewis took from Turner's apartment belonged to him and Lewis. We find no merit to the defendant's claim.

In order to prove the commission of a robbery, the state must prove that the defendant used or threatened the use of force in the commission of a larceny. See General Statutes § 53a-133; *State* v. *Croswell*, 223 Conn. 243, 250, 612 A.2d 1174 (1992). "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an *owner*. . . ." (Emphasis added.) General Statutes § 53a-119. "An 'owner' means any person who has a right to possession superior to that of a taker, obtainer or withholder." General Statutes § 53a-118 (a) (5); see *State* v. *Taylor*, 196 Conn. 225, 229, 492 A.2d 155 (1985).

We agree with the defendant that the evidence establishes that he and Lewis operated a drug business and that Turner stored the drugs and money in his apartment as a part of the business. The defendant further asserts, however, that he was the "owner" of the drugs and money taken from Turner's apartment, and that he, therefore, could not commit larceny of his own property. We disagree.

The property in which the defendant claims an ownership interest is "contraband" as defined in General Statutes § 54-36a (1): "[A]ny property, the possession of which is prohibited by any provision of the general statutes . . . ." We note that we have never answered the precise question of whether a person may legally regain contraband from another's possession. Although we recognize that General Statutes § 53a-118 (a) (1) could be read to include contraband under the definition of property; (" '[p]roperty' means any money, personal property . . . or article of value of any kind"); we have serious doubts about allowing a person to claim a property interest in contraband, the possession of which is per se illegal. A person should not be allowed to vest himself with a possessory interest by crime or to invoke the law in order to disengage himself from

the unlawfulness of his conduct. It is more reasonable to interpret § 53a-118 (a) (1) to preclude the defendant's ownership of cocaine and the money made from its sale. See *United States* v. *Jeffers*, 342 U.S. 48, 52–54, 72 S. Ct. 93, 96 L. Ed. 59 (1951) (no property rights in contraband); *United States* v. *Parks*, 684 F.2d 1078, 1083 n.7 (5th Cir. 1982). We, therefore, conclude that the defendant here had no legal right to recover the cocaine or the money made from the sale of cocaine.

We further conclude that a person commits a robbery when he forcibly takes contraband from another person's possession. We find that it would be contrary to our statutes and absurd to hold that the defendant cannot be convicted of robbery in the first degree when he takes contraband from another person. To hold that a person may use violence to recover contraband "would be to give our imprimatur to an act the completion of which is itself a criminal offense . . . ." *Townsend* v. *United States*, 549 A.2d 724, 727 n.6 (D.C. App. 1988). Several courts have held that a person may not use force to retake drugs and collect illegal debts from another person. Id.; *Cates* v. *State*, 21 Md. App. 363, 374, 320 A.2d 75 (1974); *People* v. *Karasek*, 63 Mich. App. 706, 712–13, 234 N.W.2d 761 (1975); *People* v. *Reid*, 69 N.Y.2d 469, 475, 508 N.E.2d 661, 515 N.Y.S.2d 750 (1987); *Commonwealth* v. *Sleighter*, 495 Pa. 262, 267, 433 A.2d 469 (1981). "For the law to approve the collection of an illegal obligation would serve only to encourage the use of violence in the collection of such debts . . . ." *Commonwealth* v. *Sleighter*, supra, 267. The Maryland Appellate Court stated: "[W]e decline . . . to substitute in this State the 'rule of the gun' for the 'rule of reason.' " *Cates* v. *State*, supra, 374; see also *People* v. *English*, 32 Ill. App. 3d 691, 693, 336 N.E.2d 199 (1975) ("a creditor may not employ violence, threats, or weapons to collect the debt but should pursue his remedies in the normal channels of peaceful and legal

redress"); *State* v. *Mejia*, 141 N.J. 475, 499, 662 A.2d 308 (1995) ("emerging trend in other jurisdictions rejects the claim-of-right defense to robbery").

Although we have rejected the defendant's claim of ownership, we still must resolve the issue of whether Turner was an "owner" within the meaning of § 53a-118 (a) (5). We have held that the state need not prove that the stolen property must have been taken from the actual owner. In *State* v. *Taylor*, supra, 196 Conn. 230, we upheld a conviction of first degree larceny where the victim, "although not the actual owner, was in lawful possession of the property and held a possessory right obviously greater than that of the defendant."

We recently followed *Taylor* in *State* v. *Crosswell*, supra, 223 Conn. 253. In that case, the defendant, Dennis Crosswell, along with Charlyene Holmes, Everald Howard and "Jasper" took $15,000 from an apartment. There was testimony in that case from Holmes that she believed the money was drug money and that it was being held for Jasper by a friend of Jasper's who lived in the apartment. Id., 252. The defendant claimed he was acting as an agent for Jasper when he helped to recover the money, but there was evidence to the contrary. Id., 253. The defendant had worn a mask, the defendant retained part of the money and Holmes misidentified herself in order to allow the group to gain access to the apartment. Id. We concluded that "[t]he state's evidence established, at a minimum, that someone other than the defendant and his confederates had custody or control of the money that they appropriated. In accordance with the view of courts in other jurisdictions that have considered this question, we hold that a showing that the victim had custody or control over the appropriated property is sufficient to support a charge of larceny. See *People* v. *Gould*, 384 Mich. 71, 79–80, 179 N.W.2d 617 (1970); *State* v. *Carlos*, 187 N.J. Super. 406, 412, 455 A.2d 89 (1982); *People* v. *Hutchin-*

*son,* 56 N.Y.2d 868, 869, 438 N.E.2d 1109, 453 N.Y.S.2d 394 (1982); *State* v. *Land,* 681 S.W.2d 589, 591 (Tenn. Crim. App. 1984)." *State* v. *Crosswell, supra,* 254.

It cannot be said, therefore, that the defendant, under any reasonable interpretation of the facts in this case, had a superior right to the cocaine and money than Turner and Fields thereby justifying the use of force in the recovery of the property. We reject, therefore, the defendant's claim that there was insufficient evidence to convict him of two counts of felony murder.

## II

The defendant claims that the trial court improperly refused to order a psychiatric examination of the state's witness, Ruiz, whose psychiatric records demonstrated a history of mental illness, delusions and narcotics use. The defendant argues that in so doing the trial court abused its discretion by determining that Ruiz was competent to testify and also deprived him of the opportunity to cross-examine Ruiz effectively in violation of his sixth amendment right to confrontation.[2] We conclude that the trial court did not abuse its discretion when it denied the defendant's motion for a psychiatric examination and found Ruiz competent to testify. We also conclude that the defendant was afforded the opportunity to cross-examine Ruiz effectively.

It is well settled that a defendant's constitutional right to confront and cross-examine witnesses against him includes the opportunity to explore the witness' mental capacity to observe, recollect and narrate an occur-

---

[2] The sixth amendment to the federal constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Article first, § 8, of our state constitution contains a virtually identical provision. Because the defendant has not provided any independent analysis under the state constitution, we limit our analysis to the federal constitution. *State* v. *Dyson,* 238 Conn. 784, 794, 680 A.2d 1306 (1996).

rence. *State* v. *Esposito*, 192 Conn. 166, 176, 471 A.2d 949 (1984). To ensure that this right is protected, we have established a well recognized procedure. On a proper showing by the defendant that a witness' capacity may be substantially diminished because of a mental condition, the state may be required to obtain the consent of the witness for disclosure of the witness' privileged psychiatric records; General Statutes § 52-146e; or the witness' testimony may be stricken. *State* v. *Bruno*, 236 Conn. 514, 522–23, 673 A.2d 1117 (1996); *State* v. *Pratt*, 235 Conn. 595, 607, 669 A.2d 562 (1995); *State* v. *D'Ambrosio*, 212 Conn. 50, 61, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990); *State* v. *Hufford*, 205 Conn. 386, 400–406, 533 A.2d 866 (1987); *State* v. *Esposito*, supra, 179–80; *State* v. *Storlazzi*, 191 Conn. 453, 455–63, 464 A.2d 829 (1983).

In this case, before Ruiz testified, the defendant requested access to Ruiz' psychiatric records, and the court held a hearing during which the state obtained Ruiz' consent to allow the trial court to conduct an in camera review of those records.[3] At that hearing, Ruiz testified that he was twenty years old and had been continuously incarcerated since the age of seventeen. Ruiz stated that he had been treated during this period for alcohol and drug abuse and had undergone psychiatric counseling. Ruiz testified that at no time prior to incarceration had he ever been treated by a counselor, or for alcohol and drug abuse. Ruiz also agreed to permit the trial court to turn over any records to defense counsel that the court deemed necessary.

After conducting an in camera review of Ruiz' department of correction file, the trial court found that the

[3] The state concedes that the defendant would be able to make the requisite showing of a "reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right to confrontation . . . ." *State* v. *Esposito*, supra, 192 Conn. 179.

bulk of the file did not contain privileged information. The court further found that the portions of the file that fell under the psychiatric privilege required disclosure because of indications of hallucinations and other psychological considerations that related to Ruiz' capacity to testify.[4] The court thereafter turned the entire file over to defense counsel. After reviewing the file, the defendant, on May 31, 1994, filed a motion requesting the trial court to order a psychiatric examination of Ruiz. The defendant argued that an examination was necessary to determine whether Ruiz was a reliable and credible witness, whether he could accurately recollect and truthfully relate events and whether he was competent to testify.[5]

In support of his motion, the defendant pointed to the following information from Ruiz' file. Ruiz had been heavily involved in drug use prior to his incarceration. While incarcerated, Ruiz had a record of continuous psychiatric problems, and had often indicated that "Lucifer" or "Red Bean" was inside of him directing him to kill someone and to burn himself. Ruiz also had reported experiencing hallucinations and flashbacks. On May 30, 1991, Ruiz was diagnosed as "schizopheno ORM" and possible "affect[ive] disorder." Similar diagnoses were

---

[4] The court noted that there were approximately 4000 pages in the file. The defendant also had access to Ruiz' juvenile offender file from the Long Lane School, but the court and defense counsel determined that there was nothing in the file that indicated that Ruiz had received any psychiatric treatment.

[5] The defendant's motion cited State v. Canady, 187 Conn. 281, 445 A.2d 895 (1982), and State v. Manning, 162 Conn. 112, 291 A.2d 750 (1971). These cases concern the trial court's discretion to order a psychiatric examination for the purpose of determining whether a witness is competent to testify and do not mention a defendant's right to confrontation. The defendant also made no oral arguments regarding his right to confrontation before the trial court. We conclude, therefore, that the defendant did not request the trial court to order a psychiatric examination in order to provide him with material for his cross-examination of Ruiz, but, rather to determine the competency of Ruiz.

made in September, 1991, April, 1992, and in 1993. For approximately three years while incarcerated, Ruiz was treated with the drugs Haldol and Thorazine. Over the course of his incarceration, Ruiz attempted suicide on at least twenty occasions. The defendant also argued that Ruiz' mental state was particularly important because Ruiz had implicated the defendant in a May 28, 1991 statement to police, only two days before being diagnosed as schizophrenic and delusional.

The trial court denied the defendant's motion. The court held that the circumstances did not warrant a compelled psychiatric examination of Ruiz. The court particularly noted that the defendant could use the voluminous record to cross-examine Ruiz and that there were other means by which the defendant could develop his own evidence concerning Ruiz' mental condition.

We first conclude that the trial court did not abuse its discretion in refusing to order a psychiatric examination of Ruiz for the purpose of determining whether Ruiz was competent to testify. " 'The competency of a witness is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or some error in law.' *State* v. *Manning*, 162 Conn. 112, 115, 291 A.2d 750 (1971)." *State* v. *Canady*, 187 Conn. 281, 291–92, 445 A.2d 895 (1982); *State* v. *Piskorski*, 177 Conn. 677, 716–17, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Orlando*, 115 Conn. 672, 675, 163 A. 256 (1932). " '[I]n determining the competency of a proposed witness the trial court should consider the capacity of the witness to receive correct sense impressions, to comprehend the facts to be developed, to recollect and narrate facts intelligently, and to appreciate the moral duty to tell the truth.' . . . *State* v. *Boulay*, 189 Conn. 106, 108, 454 A.2d 724 (1983)." *State* v. *Weinberg*, 215 Conn. 231, 242, 575 A.2d 1003,

cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990).

In *State* v. *Weinberg*, supra, 215 Conn. 243–44, we concluded that rule 601 of the Federal Rules of Evidence, "as applied by the federal courts, establishes a reasoned approach to determining the admissibility of a witness' testimony. . . . [W]here the competency of a witness is challenged, the threshold question to be answered by the court is whether the testimony of that witness is minimally credible. If the testimony of a witness passes the test of minimum credibility, and is otherwise relevant, the testimony is admissible and the weight to be accorded it, in light of the witness' incapacity, is a question for the trier of fact." Rule 601 "reflects a strong presumption in favor of witness competency." *Borawick* v. *Shay*, 68 F.3d 597, 601 (2d Cir. 1995); *United States* v. *Khoury*, 901 F.2d 948, 966 (11th Cir. 1990); *United States* v. *Bloome*, 773 F. Sup. 545, 546 (E.D.N.Y. 1991).

The trial court had the opportunity to observe Ruiz at the preliminary hearing in which Ruiz consented to the disclosure of his psychiatric records and when he was called to testify. The court, therefore, had a first-hand opportunity to evaluate whether Ruiz could understand the questions posed to him and could respond in a coherent manner. There is nothing in the transcript to indicate that the trial court's evaluation of Ruiz' mental capacity and the court's subsequent ruling constituted an abuse of discretion. See *State* v. *Weinberg*, supra, 215 Conn. 244 (even where parties agreed to examination of witness by independent psychiatrist and psychiatrist concluded that witness was incompetent to testify, trial court did not abuse its discretion in concluding otherwise after observing witness); *State* v. *Stankowski*, 184 Conn. 121, 140, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981) (trial court has ability to observe witness' demeanor and ability to

answer questions). The defendant argues, however, that because Ruiz' file showed that Ruiz had been prescribed Haldol only twenty-six days prior to his testimony, the trial court abused its discretion in determining that Ruiz was competent to testify. We disagree. The defendant failed to present any evidence that this prescription drug affected Ruiz, and Ruiz testified that he was not currently taking any drugs. Moreover, our review of the transcript also confirms that Ruiz repeatedly testified in a cogent and responsive manner.

Our case law demonstrates that the " 'drastic measure' " of ordering a psychiatric examination; *United States* v. *Riley*, 657 F.2d 1377, 1387 (8th Cir. 1981), cert. denied, 459 U.S. 1111, 103 S. Ct. 742, 74 L. Ed. 2d 962 (1983), quoting *United States* v. *Russo*, 442 F.2d 498, 502 (2d Cir. 1971), cert. denied, 404 U.S. 1023, 92 S. Ct. 669, 30 L. Ed. 2d 673 (1972); should be taken only upon "compelling reasons." *State* v. *Dabkowski*, 199 Conn. 193, 197–98 n.5, 506 A.2d 118 (1986); see *State* v. *Manini*, 38 Conn. App. 100, 119, 659 A.2d 196, cert. denied, 234 Conn. 920, 661 A.2d 99 (1995). "In *State* v. *Dabkowski*, [supra, 193] . . . [we] . . . rejected the 'Wigmore rule,' which suggests that a 'complaining witness, in a case relating to a sex offense, should always be compelled to submit to a psychiatric examination.' See 3A J. Wigmore, Evidence (Chadbourn Rev. 1970) § 924a." *State* v. *Manini*, supra, 118. Such an examination should not be ordered if the trial court, " 'after hearing the testimony of the witness, has no doubt of [the witness'] mental soundness.' " *State* v. *Canady*, supra, 187 Conn. 291, quoting *State* v. *Vars*, 154 Conn. 255, 268, 224 A.2d 744 (1966); see also *State* v. *Manning*, supra, 162 Conn. 115. In making such a determination, the trial court may make use of its own observations of the witness. *State* v. *Canady*, supra, 292.

Moreover, Ruiz' factual reports were independently corroborated by other evidence presented by the state,

particularly the defendant's January statement given to police in which the defendant stated that he was in Lewis' car when Lewis went into the victims' apartment on Howard Avenue on the night of the murders. This corroboration demonstrates that Ruiz "possessed sufficient powers of observation, recollection, narration and truthfulness to meet the threshold requirement of minimum credibility." *State* v. *Weinberg*, supra, 215 Conn. 244; see *United States* v. *Raineri*, 670 F.2d 702, 709 (7th Cir.), cert. denied, 459 U.S. 1035, 103 S. Ct. 446, 74 L. Ed. 2d 601 (1982) (no abuse of discretion in permitting witness to testify in absence of psychiatric examination where witness' testimony was corroborated). Both Ruiz' testimony and the defendant's statement indicated that the defendant went with Lewis to the victims' apartment for drug-related business that night, that Lewis had run out of the apartment building after a short period of time and that Lewis had later thrown the murder weapon off the Chapel Street Bridge.

Furthermore, Diane Basilicato testified that, in October, 1990, she had lived in the apartment next to the victims' apartment. Basilicato testified that she had arrived home at 4:01 a.m. on October 11, 1990, and had begun to watch television when she heard a banging and then two people running down the apartment building's stairs. This corroborated Ruiz' testimony that both the defendant and Lewis had entered the apartment while Ruiz waited in the car.

In addition, Jose Roque had provided police with a tape-recorded statement that was admitted into evidence. In his statement, Roque indicated that he had heard the defendant and Lewis discussing the murders. Roque told police that the defendant had said to Lewis, "you did what you had to do," and Lewis responded affirmatively. Roque also stated that he had seen Lewis throw the murder weapon off the Chapel Street Bridge.

Ruiz had also testified that the bullets for the guns in the Clay Street house had been purchased at Chris' Gun Shop on Grand Avenue in New Haven. The state presented evidence that the bullets fired at the murder scene were Federal Hydroshock .357 caliber. Detective William Piascyk testified that on October 11, 1990, he had checked with all three gun shops located within the general area of New Haven and that only Chris' Gun Shop sold Federal Hydroshock ammunition.

We conclude that the trial court did not abuse its discretion by refusing to resort to the drastic measure of ordering a psychiatric examination in order to determine whether Ruiz was competent to testify. The trial court, which had examined the correction department records, had a face-to-face opportunity to evaluate whether Ruiz could testify in a coherent manner with an appreciation of the oath and Ruiz' testimony was substantially corroborated. After examining the record, we also conclude that at all times Ruiz testified in a clear, coherent and responsive manner. The record reveals, therefore, that the trial court did not abuse its discretion in determining that Ruiz was competent to testify.

The defendant also asks us to conclude that the trial court improperly refused to require Ruiz to undergo a psychiatric examination in order to provide material for his cross-examination of Ruiz. The defendant argues that by denying his request, the trial court prevented him from pursuing a line of inquiry calculated to discredit Ruiz. The defendant's trial motion did not explicitly address his right of confrontation,[6] and the defendant now requests that we review this claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[7]

---

[6] See footnote 5 of this opinion.

[7] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is

The defendant does have a right under the confrontation clause "to expose to the jury the facts from which jurors, as the sole triers of facts and credibility, [can] appropriately draw inferences relating to the credibility of the [state's] witnesses." *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Ouellette,* 190 Conn. 84, 101–103, 459 A.2d 1005 (1983). The confrontation clause requires that "[if] the testimony of such a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to discover any infirmities that may cast serious doubt upon its truthfulness." *State* v. *Pierson,* 201 Conn. 211, 227, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989). We therefore review the defendant's claim, but conclude that the defendant has not clearly demonstrated a constitutional violation that deprived him of a fair trial.

While the competency of a witness is for the trial court to evaluate, the credibility of a witness is for the jury to determine. See *State* v. *Weinberg,* supra, 215 Conn. 244; *United States* v. *Ramirez,* 871 F.2d 582, 584 (6th Cir.), cert. denied, 493 U.S. 841, 110 S. Ct. 127, 107 L. Ed. 2d 88 (1989); *United States* v. *Bloome,* supra, 773 F. Sup. 546. The trial court may, in its discretion, limit the cross-examination of a witness so long as the defendant's right to confrontation is not impaired. *State* v. *Asherman,* 193 Conn. 695, 718, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). This discretion includes "matter[s] of discovery [concerning mental capacity] where material

adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding,* supra, 213 Conn. 239–40.

is sought for impeachment purposes." *State* v. *Esposito*, supra, 192 Conn. 179; *State* v. *Januszewski*, 182 Conn. 142, 171, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). We have held that the trial court has broad discretion in deciding whether to order the psychiatric examination of a witness for the purposes of impeachment. See *State* v. *Piskorski*, supra, 177 Conn. 716–17; *State* v. *Manini*, supra, 38 Conn. App. 117–19; see also *United States* v. *Fountain*, 840 F.2d 509, 517 (7th Cir.), cert. denied, 488 U.S. 982, 109 S. Ct. 533, 102 L. Ed. 2d 564 (1988); *United States* v. *Pino*, 827 F.2d 1429, 1430 (10th Cir. 1987); *United States* v. *Raineri*, supra, 670 F.2d 709.

Again, it has been emphasized that the discretion to condition a witness' testimony on the witness' submission to a psychiatric examination "should be exercised sparingly." *United States* v. *Gutman*, 725 F.2d 417, 420 (7th Cir.), cert. denied, 469 U.S. 880, 105 S. Ct. 244, 83 L. Ed. 2d 183 (1984). "The [trial] court was entitled to be leery of both psychiatric examinations of witnesses and psychiatric testimony about witnesses, because the jury can observe for itself . . . the witness's behavior. Criminal trials are complex enough without turning them into collateral investigations of the witnesses— investigations that would not only drag out trials and confuse jurors but also discourage people from serving as witnesses." *United States* v. *Fountain*, supra, 840 F.2d 517.

The trial court provided the defendant with Ruiz' entire department of correction file, which contained all the records of psychiatric counseling and treatment that Ruiz had received up to the time of trial. The defendant extensively cross-examined Ruiz regarding his psychiatric history, his criminal background and his recollection of the events of October 10 and 11, 1990. On cross-examination, Ruiz stated that he had lied to correction department authorities and doctors about

his mental condition to protect himself. On redirect examination, Ruiz testified that he told doctors that he heard voices only so that he would be taken out of the general population of the correction facility and be placed into protective custody. Ruiz testified that he wanted to be in protective custody because after other inmates had learned that he was a "snitch," they often assaulted him. To corroborate Ruiz' explanation, the state presented in evidence a letter that Ruiz had received in early 1992. The letter warned Ruiz: "Don't testify, because if you do, you are as good as dead." The defendant argues that although he had access to all of Ruiz' records, without a compelled psychiatric examination he could not "counter Ruiz' claims of fabrication." We disagree.

When the trial court denied the defendant's motion for a psychiatric examination, the court suggested to the defendant that he could develop his own independent evidence, but the defendant did not accept this invitation.[8] The defendant did not attempt to call as witnesses the psychiatrists and other prison counselors who had treated Ruiz and reported his psychiatric history. The defendant also could have presented testimony from his own expert based on the expert's independent analysis of Ruiz' records. " '[A] defendant's right [of cross-examination] is not infringed if the defendant fails to pursue a line of inquiry open to him. . . . The test is whether the opportunity to cross-examine existed, not whether full use of such opportunity was made.' " *State* v. *Bruno*, supra, 236 Conn. 533, quoting *State* v. *Mastropetre*, 175 Conn. 512, 522, 400 A.2d 276 (1978).

We conclude that the trial court did not abuse its discretion in refusing to condition Ruiz' testimony on

---

[8] In addition, the defendant's motion did not specify a psychiatrist who would conduct such an examination and under what circumstances the examination would be conducted, thus rendering the proposed examination more difficult for the trial court to consider as an aid to cross-examination.

his submission to a psychiatric examination. *State* v. *Piskorski,* supra, 177 Conn. 716–17; *State* v. *Manini,* supra, 38 Conn. App. 119. "Wisely, we have historically left credibility determinations to the trier of fact, and we see no reason to depart from that procedure under the facts of this case." *United States* v. *Ramirez,* supra, 871 F.2d 585. A compelled psychiatric examination of a witness can be a " 'tool of harassment' "; *State* v. *Canady,* supra, 187 Conn. 291, quoting *United States* v. *Benn,* 476 F.2d 1127, 1131 (D.C. Cir. 1973); and the discretion to order an examination should be exercised sparingly. Having heard the extensive cross-examination of Ruiz, the jury could determine the weight to be accorded his testimony. See *State* v. *Weinberg,* supra, 215 Conn. 231.[9] The defendant, therefore, has not demonstrated a constitutional violation that deprived him of a fair trial.

## III

The defendant claims that the trial court improperly instructed the jury regarding the credibility of his alibi witnesses.[10] The defendant did not object to the instruc-

[9] The defendant also argues that the trial court deprived him of his right to present a defense by not ordering a competency examination of Ruiz. The defendant has a right under the compulsory process and due process clauses "to present [his] version of the facts as well as the prosecution's to the jury so [that] it may decide where the truth lies." *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). The defendant argues that without a court-ordered examination, the defendant could not present expert testimony regarding Ruiz' mental capacity. *State* v. *Cavell,* 235 Conn. 711, 720, 670 A.2d 261 (1996) ("under particular circumstances, the unjustified exclusion of a witness' testimony can amount to a deprivation of the defendant's right to present a defense"); *State* v. *Christiano,* 228 Conn. 456, 474, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994). The defendant did not raise this claim before the trial court, but seeks review of any unpreserved claims pursuant to *State* v. *Golding,* supra, 213 Conn. 239–40. For the reasons discussed above, however, we conclude that the defendant has not demonstrated a constitutional violation that clearly deprived him of a fair trial.

[10] The trial court instructed the jury: "In connection with the alibi defense you have heard testimony from certain defense witnesses concerning the

tion at trial, but seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40.[11] The defendant recognizes that this court has previously upheld the challenged instruction; *State* v. *Ryerson*, 201 Conn. 333, 348, 514 A.2d 337 (1986); yet argues that "the instruction is outmoded and unfair by today's standards, and should be disapproved." The defendant argues that the instruction violated the presumption of innocence and his right to present a defense as established by the fifth, sixth and fourteenth amendments to our federal constitution and article first, § 8, of our state constitution. The defendant's claim is unavailing.

A defendant cannot transform a nonconstitutional claim into a constitutional claim by placing a label on it. "[C]laimed instructional errors regarding general principles of credibility of witnesses are not constitutional in nature. *State* v. *Tatum*, 219 Conn. 721, 738, 595 A.2d 322 (1991)." *State* v. *Walton*, 227 Conn. 32, 65, 630 A.2d 990 (1993). Accordingly, we conclude that the defendant has not alleged a constitutional violation.

## IV

The defendant claims that the trial court improperly instructed the jury on the concept of reasonable doubt

defendant's alleged presence in North and South Carolina at the time that the murders were committed. In connection with this alibi evidence please keep in mind that the kind of evidence relating to a claimed alibi frequently will, and in this case did, consist, in part, at least, of the testimony of witnesses who are related to or friends or associates of the accused and who may, therefore, be held to be in a greater or lesser degree interested in the outcome of the case.

"The liability of the human mind to make honest mistakes as to dates and times when certain events occur is a matter of common knowledge. Interested persons sometimes jump quickly to the time of an occurrence when such a time would be favorable to some desirable end or persons may at a later time be led to make a mistake when their memory is no longer certain in respect to such date and time. This evidence should be given the weight that you think it deserves and should be considered by you along with all the other evidence in the case in reaching a verdict."

[11] See footnote 7 of this opinion.

in violation of his rights to due process and a jury trial guaranteed by the federal and state constitutions. The defendant did not raise this claim at trial, but again seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, and the plain error doctrine.[12] Because the defendant alleges the violation of a fundamental constitutional right, we will review his claim. We previously have rejected nearly identical claims, and we here adhere to our prior decisions.

The defendant argues that the trial court diluted his presumption of innocence by two passages in its instructions to the jury.[13] The defendant points to the

---

[12] "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Taylor*, 239 Conn. 481, 502, 687 A.2d 489 (1996).

[13] The trial court's complete instruction to the jury on the concept of reasonable doubt was as follows: "The law says that the state must not only prove [the defendant] guilty, but must prove him guilty beyond a reasonable doubt. It is not enough for the state to make out a case of probable guilt, but the burden on the state, which never shifts, is to prove the defendant guilty beyond a reasonable doubt. It is not required that the state prove the defendant guilty beyond all possible doubt.

"Now, a reasonable doubt means this, it is a doubt for which a reasonable man or woman can give a valid reason. The burden of proving his guilt beyond a reasonable doubt requires the state to produce sufficient evidence to create, in your minds, a strong and abiding conviction of the guilt of the defendant. In other words, it is the law that the evidence must be so sufficient that it would leave no room in your mind for any reasonable hypothesis of the innocence of the accused. Proof of guilt beyond a reasonable doubt must exclude every reasonable supposition of innocence, but it need not exclude every possible supposition of innocence.

"A reasonable doubt is not a doubt raised by one who questions for the sake of raising a doubt. A reasonable doubt is not a surmise or speculation or conjecture or an imaginary doubt. A reasonable doubt is not captious or a frivolous doubt nor is it a doubt which is raised by the ingenuity of counsel or by a juror and unwarranted by the evidence nor is it a doubt prompted by sympathy for the defendant. A reasonable doubt is a real doubt, an honest doubt, a doubt which has its foundation in the evidence offered in the case or the lack of evidence.

"Absolute certainty in the affairs of life is almost never attainable and the law does not require absolute certainty to authorize a conviction. What

court's instruction that "[i]t is not required that the state prove the defendant guilty beyond all possible doubt. Now, a reasonable doubt means this, it is a doubt for which a reasonable man or woman can give a valid reason." The defendant does not offer us any reason to depart from our previous decisions approving such an instruction under both the federal and the state constitutions. *State* v. *Kelley*, 229 Conn. 557, 567, 643 A.2d 854 (1994); *State* v. *Adams*, 225 Conn. 270, 290–91, 623 A.2d 42 (1993); *State* v. *Derrico*, 181 Conn. 151, 170–71, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980).

The defendant also points to the court's instruction that "[a] reasonable doubt is a doubt which would cause you as reasonable and prudent men and women to hesitate to act in the more weighty and important matters relating to your own affairs." In *State* v. *Smith*, 210 Conn. 132, 147–50, 554 A.2d 713 (1989), we agreed with the United States Supreme Court that the "hesitate to act" language accurately conveys the concept of reasonable doubt. See *Holland* v. *United States*, 348 U.S. 121, 140, 75 S. Ct. 127, 99 L. Ed. 150 (1954); see also *State* v. *Rodriguez*, 37 Conn. App. 589, 616–19, 658 A.2d 98, cert. denied, 234 Conn. 916, 661 A.2d 97 (1995).

Accordingly, we conclude that the trial court correctly conveyed the concept of reasonable doubt to the jury. The defendant has not been denied either due process or a right to a jury trial, and he has not been prejudiced by plain error.

The judgment is affirmed.

In this opinion the other justices concurred.

---

it does require is that the guilt be established as charged beyond a reasonable doubt, which is one founded upon the evidence or lack of evidence.

"A reasonable doubt is a doubt which would cause you as reasonable and prudent men and women to hesitate to act in the more weighty and important matters relating to your own affairs. Proof beyond a reasonable doubt is proof wholly consistent with the defendant's guilt and inconsistent with any rational conclusion."