## STATE OF CONNECTICUT *v.* CALVIN KING
### (AC 30419)

Flynn, C. J., and Robinson and West, Js.

Argued May 28—officially released August 11, 2009

*Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Edward R. Narus*, senior assistant state's attorney, and *Thomas R. Garcia*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Calvin King, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a, conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35. On appeal, the defendant claims that

(1) the evidence was not sufficient to sustain his conviction of conspiracy to commit murder and (2) the court improperly instructed the jury on issues of credibility. We affirm the judgment of the trial court.

The following facts, as reasonably could have been found by the jury, are relevant to our resolution of the issues on appeal. On December 28, 2002, very late in the evening, the defendant, then age fifteen, and his nephew, Rondell Bonner, arrived at the apartment of Annibell Trimmier, asking to use her telephone. Trimmier lived with her son, daughter and grandson in an apartment at 37 Cabot Street in Hartford. The defendant and Bonner frequently were at Trimmier's apartment, and Trimmier considered these boys or young men to be like family, her nephews; they even called Trimmier "auntie." While the defendant and Bonner were talking on the telephone, Trimmier was in her bedroom. After a while, she went into the living room, where the defendant and Bonner then were sitting on the couch. Trimmier saw two semiautomatic handguns also on the couch, one black and one silver. Immediately, she told the defendant and Bonner that they had to leave because they knew that she did not allow guns in her home. As they left the apartment, the defendant picked up the silver handgun and Bonner picked up the black one, each securing a handgun in his waistband, and they both apologized to Trimmier for bringing the handguns into her home. Trimmier soon heard the defendant and Bonner talking with some girls in the hallway outside of her apartment.

After the defendant and Bonner left Trimmier's apartment, they met Brittany Simpson and three of her friends, and they all talked in the hallway of the apartment building for a while. When they left the building and went outside, Bonner asked the girls to go to a nearby gasoline station to purchase a cigar for him. The girls agreed and began walking down Cabot Street.

From inside her apartment, Trimmier heard Bonner say, "that's my boy," as he and the defendant stepped away from the apartment building. The girls saw a white male drive his vehicle in front of 37 Cabot Street, where both the defendant and Bonner approached the vehicle to sell drugs to the occupant, Bonner on the driver's side and the defendant toward the back of the vehicle, but very close by Bonner's right side. Both the defendant and Bonner were known drug sellers. Simpson then heard an argument between Bonner and the man in the vehicle, and she heard Bonner yell, "he's trying to play me," as the man in the vehicle started to drive away. Simpson assumed that the man was attempting to leave without paying Bonner for drugs. She then heard gunfire, and she saw Bonner holding and firing a black handgun, which was pointed at the man in the vehicle. From inside of her apartment Trimmier also heard loud gunfire, which sounded like fireworks to her. Simpson could not see if the defendant had a weapon from where she stood.

As the man in the vehicle began to drive away, he was hit by several bullets, and his vehicle came to a stop on the sidewalk, near a fence, a short distance down the road. The defendant and Bonner ran away. As they ran, each was seen holding something under his coat. Bonner dropped a bag of crack cocaine as he ran from the murder scene, which he later asked Trimmier to try to find for him. Bonner telephoned Trimmier several times shortly after the murder, attempting to find out what was happening outside of Trimmier's apartment, and she provided updates to him. Bonner told Trimmier all about the shooting, to which she responded that he would "hang" for it.

Sergeant William Mooney of the Hartford police deparment arrived at the scene after someone reported that gunshots had been fired on Cabot Street. When Mooney approached the vehicle on the sidewalk, he

observed several bullet holes in the vehicle, and he saw a man slumped in the driver's seat, not moving. Mooney attempted to find a pulse by holding the man's wrist, but the man was nonresponsive. The man in the vehicle had been hit by six bullets and was dead. He later was identified as Scott P. Houle. The police discovered a bag of crack cocaine near the murder scene and sixteen spent shell casings, seven of which had been fired from a single nine millimeter semiautomatic Glock pistol, and nine of which had been fired from a different nine millimeter pistol. One of the bullet fragments that was recovered, which had not been fired from the Glock pistol, was consistent with having been fired from a nine millimeter semiautomatic Lorcin firearm. Lorcin makes a silver, chrome colored nine millimeter pistol.

Less than three months after the murder, the defendant sold the Glock pistol to Tyree Downer. Subsequently, the police recovered this weapon, and they determined that it was the pistol that had fired seven of the shell casings discovered at the murder scene. The other weapon never was recovered. However, the defendant, while being held on charges unrelated to the present case, told another inmate, whom he and Bonner had known for at least five years, about the murder of Houle. He explained to this inmate that he had gotten rid of the pistol that he had used during the shooting and that he had sold the Glock pistol to Downer. He also told this inmate that after Bonner started firing at the vehicle, he fired, too.

On June 9, 2004, the defendant was arrested and charged with the murder of Houle. He was charged in a three count information with murder, conspiracy to commit murder and carrying a pistol or revolver without a permit. After a jury trial, the defendant was convicted on all counts, and he received a total effective sentence of fifty years imprisonment, execution suspended after

thirty-five years, with five years probation. This appeal followed.

I

The defendant first claims that there was insufficient evidence that he had entered into a conspiracy to commit murder. He argues that the evidence demonstrates that, especially in light of his youth and inexperience, his actions were indicative of a spontaneous response rather than a concerted effort. We do not agree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . We note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 329–30, 929 A.2d 278 (2007).

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . We do not sit as a [thirteenth] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record." (Internal

quotation marks omitted.) *State* v. *Davis*, 68 Conn. App. 794, 798, 793 A.2d 1151, cert. denied, 260 Conn. 920, 797 A.2d 518 (2002).

"To establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Further, the prosecution must show both that the conspirators intended to agree and that they intended to commit the elements of the underlying offense." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 657–58, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

Because the defendant was convicted of conspiracy to commit murder, we must consider the essential elements of the crime of conspiracy. See *State* v. *Green*, 261 Conn. 653, 669, 804 A.2d 810 (2002). "To establish the crime of conspiracy [to commit murder . . . the state must show] that an agreement was made between two or more persons to engage in conduct constituting [the crime of murder] and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . While the state must prove an agreement [to commit murder], the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these

acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Internal quotation marks omitted.) Id.

The record reflects the following relevant evidence. Bonner and the defendant were known drug sellers. They each had handguns when they left Trimmier's apartment very late on the night of December 28, 2002. Bonner's handgun was a black semiautomatic Glock, and the defendant's handgun was a semiautomatic silver pistol. As they left Trimmier's apartment, Bonner and the defendant each hid his own gun in the waistband of his pants. When Bonner approached Houle's vehicle to make a drug sale, and Houle attempted to drive off without paying for the drugs, Bonner immediately opened fire on the vehicle before Houle could get away. The defendant opened fire as well. Houle was killed, and Bonner and the defendant ran from the scene.

Although the defendant argues that there is no evidence to support a conspiracy theory, we conclude that the inferences reasonably drawn from the evidence outlined previously support the jury's finding of a conspiracy. To prove a conspiracy to commit murder, the state had to show that the defendant and Bonner intended to commit murder and that, with the intent to agree, an agreement was made between the defendant and Bonner to commit the crime of murder and that the agreement was followed by an overt act in furtherance of the conspiracy by either one of the conspirators. See *State* v. *Booth*, supra, 250 Conn. 657–58. In this case, it certainly would have been reasonable for the jury to have concluded that Bonner and the defendant were in the business of selling illegal drugs, that Bonner identified Houle as his customer by the use of the words, "that's my boy," as he approached Houle's vehicle to make an illegal drug sale, that, despite the fact that it was Bonner's customer, the defendant

accompanied Bonner to Houle's vehicle, that both Bonner and the defendant each carried a handgun in the event that someone tried to leave without paying for the drugs that were being sold and that they had agreed to protect and support each other with the use of those handguns when necessary. When Houle drove up, Bonner went to make the drug sale, and the defendant stood very close by Bonner, just behind him and to his right. The jury reasonably could have found that the defendant stood there as backup. Once Houle attempted to drive away without paying Bonner, Bonner opened fire. The defendant, in turn, also opened fire, firing nine rounds to Bonner's seven rounds.

Although there may have been no direct evidence that Bonner and the defendant specifically had discussed and agreed that if Houle tried to drive off without paying they both would open fire, it would have been reasonable for the jury to have concluded that there existed an agreement between Bonner and the defendant that each would back up the other and that they would kill anyone who tried to steal drugs from them, and, in furtherance of this agreement, each of them carried a concealed semiautomatic handgun. On the basis of these reasonable inferences, we conclude that there was sufficient evidence for the jury to have found the defendant guilty of conspiracy to commit murder.

## II

The defendant next claims that one particular sentence in the court's instruction to the jury on credibility was improper and violated his rights under the federal constitution and the Connecticut constitution. Specifically, he argues: "The instruction that in deciding what testimony to believe, 'you should harmonize the evidence as far as it can reasonably be done,' was misleading and harmful in this case, where all of the witnesses but one were called by the state and where

raising a reasonable doubt depended mostly on defense counsel's efforts by cross-examination to show conflicts, ambiguities, incongruities and other testimonial shortcomings." This claim was unpreserved at trial, and the defendant requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5. We conclude that this claim is not of constitutional magnitude, and we further conclude that the instructions did not amount to plain error.

A defendant may prevail on an unpreserved claim of constitutional error if he meets all of the following conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

Although the record is adequate for review in the present case, we conclude that the claim is not of constitutional magnitude. See *State* v. *Dash*, 242 Conn. 143, 152, 698 A.2d 297 (1997) ("claimed instructional errors regarding general principles of credibility of witnesses are not constitutional in nature"), citing *State* v. *Tatum*, 219 Conn. 721, 738, 595 A.2d 322 (1991); see also *State* v. *Morant*, 242 Conn. 666, 686, 701 A.2d 1 (1997) (no review of claimed instructional errors regarding general principles of credibility of witnesses under either state or federal constitution because they are not constitutional in nature). Accordingly, we decline review under *Golding*.

The defendant also seeks to prevail under the plain error doctrine. We conclude, however, that there was no plain error in the court's instructions.

The plain error doctrine has been codified in Practice Book § 60-5, which provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines . . . that the decision is . . . erroneous in law. . . ." The plain error doctrine "is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that [reviewing courts invoke] in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy." *State* v. *Cobb*, 251 Conn. 285, 343 n.34, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). The plain error doctrine "is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Toccaline*, 258 Conn. 542, 552–53, 783 A.2d 450 (2001).

After reviewing the court's instructions as a whole; see *State* v. *Davis*, 261 Conn. 553, 564, 804 A.2d 781 (2002) (jury instructions must be viewed in entirety); we perceive no impropriety that would result in manifest injustice. Accordingly, we are not presented with an "extraordinary [situation] . . . that . . . affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Toccaline*, supra, 258 Conn. 552. Viewed in their entirety, the court's instructions do not rise to

the extraordinary level required for reversal under the plain error doctrine.

The judgment is affirmed.

In this opinion the other judges concurred.